**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RICHARD JAFFEE, individually and in his capacity as
owner of IRA Services Trust Company CFBO Richard
Jaffee, IRA #731316; THOMAS JAFFEE; ERIC KLEIN, in
his capacity as owner of IRA Services Trust Company
CFBO Eric Klein, IRA #732722; STEVEN SAMUELS; and
KENNETH SCHWARTZ, in his capacity as trustee of the
Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz,

Plaintiffs,

v.                                                                              Case No. 1:19-cv-08102

BROOKLYN STANDARD PROPERTIES, LLC; 157-159
WYTHE AVENUE LLC; 157-159 WYTHE AVENUE
INVESTORS LLC; BENJAMIN KOHN; and DAVID
MANHEIMER,

Defendants.                                        **COMPLAINT**

Plaintiffs RICHARD JAFFEE, individually and in his capacity as owner of IRA Services

Trust Company CFBO Richard Jaffee, IRA #731316; THOMAS JAFFEE; ERIC KLEIN, in his

capacity as owner of IRA Services Trust Company CFBO Eric Klein, IRA #732722; STEVEN

SAMUELS; and KENNETH SCHWARTZ, in his capacity as trustee of the Jeanne D. Schwartz

Family Trust FBO Kenneth Schwartz, by their attorneys Pincus Law LLC, allege for their

Complaint against Defendants BROOKLYN STANDARD PROPERTIES, LLC ("Defendant

Brooklyn Standard"); 157-159 WYTHE AVENUE LLC; 157-159 WYTHE AVENUE

INVESTORS LLC; BENJAMIN KOHN; and DAVID MANHEIMER, as follows:

**NATURE OF THE CASE**

1.      This case arises from Defendants' fraudulent inducement of Plaintiffs' investment

in Defendants' real estate development project at 157-159 Wythe Avenue in Williamsburg,

Brooklyn (the "Property").  Defendants fraudulently misled investors into two different

1

investment offerings, concealing material and ongoing construction challenges while misrepresenting their reasons for seeking each respective investment. The risks that Defendants fraudulently misrepresented and concealed eventually doomed the Project, costing Plaintiffs their entire investment of $675,000.

2.      In or before December 2015, Defendant Brooklyn Standard, a real estate development company owned by Defendants Kohn and Manheimer, arranged for an $8.43 million bank loan from Ready Capital and raised $3.082 million in common equity. The proceeds were used by Defendant 157-159 Wythe Avenue LLC to acquire the Property for $8.0 million, pay the general contractor the agreed upon $1.8 million to renovate and expand the existing structure into a four-story building with both residential and commercial space (the "Project"), pay the bank's $60,000 per month interest expense, and other various expenses. Defendants Kohn and Manheimer projected that when completed, the improved property would sell for between $16 and $18 million providing a lucrative return for their equity investors.

3.      By the spring of 2017, however, the Project was facing financial strain. After deciding to add rentable retail basement space to the Project, Defendants Kohn and Manheimer learned that excavating the basement and building the foundation would be significantly more costly and time-consuming than expected, as the general contractor they hired had run into difficulty removing bedrock and large boulders from the area.

4.      With time-consuming excavation efforts slowing the Project's progress and draining its budget, Defendants Kohn and Manheimer knew they would not have sufficient funds to complete the Project. Therefore, Defendants Kohn and Manheimer sought to raise an additional $1.2 million by issuing a Series A preferred equity tranche in Defendant 157-159 Wythe Avenue LLC. Presented as a later-stage, lower-risk investment, the preferred equity

offered a fixed return without the higher-risk, higher-reward opportunity assumed by the earlier-stage common equity investors.

5.      Defendants Kohn and Manheimer, however, realized that a preferred equity investment in a Project facing risky ongoing construction challenges would be unattractive to potential investors expecting a safer, lower-risk investment.  Therefore, Defendants Kohn and Manhemier chose to conceal these challenges and the increased default risk they posed. Defendants Kohn and Manheimer believed that, by raising these funds, they would be able to complete the Project and the Series A investors would receive their promised return without these investors ever knowing of the Project's excavation and foundation-building issues.

6.      In soliciting investment in the Series A preferred equity, Defendants Kohn and Manheimer misleadingly stated that they were raising funds to replenish the interest reserve caused by delays with the New York City Department of Buildings, with a small amount used to add commercial space in the basement and increase the value of the building.  Defendants Kohn and Manheimer, however, deliberately failed to disclose any problems excavating the basement and building the foundation, hoping to create an impression that the Project was in its finishing stages and faced no major construction obstacles.  Defendant Kohn even stated that this was a "conservative" investment and the Project would be completed within nine months.

7.      These dishonest tactics misled investors, who invested $1.2 million in Series A Preferred Equity for 157-159 Wythe Avenue LLC around June 7, 2017, including a combined $375,000 from four of the Plaintiffs in this case.  Had these Plaintiffs known the actual risks posed by the difficulties with excavating the basement and building the foundation, they would not have invested in the Series A Preferred Equity, as the risk was too high to justify the limited-upside fixed return.  The Series A Preferred Equity's actual risk profile of the Project was more

akin to the risk assumed by earlier-stage common equity investors, who were compensated with unlimited potential return.

8.      Just over a year later, Defendants sought additional funds through a second preferred equity offering (Series B).  Although the Project still faced ongoing construction challenges, including continued problems with excavation and foundation construction and other obstacles still undisclosed to date, Defendants Kohn and Manheimer purposely failed to disclose any of these issues to potential Series B investors.  Defendants Kohn and Manheimer chose not even to disclose that, as a result of the excavation challenges, they decided to stop the basement expansion and thereby abandoned efforts to fill the basement with rentable retail space, leaving the Property with a basement only suitable as storage space for ground-floor tenants.  Defendants Kohn and Manheimer also falsely stated that the Project's value had not changed, even though declining market conditions and the reduced basement footprint lowered the projected value of the building.

9.      Once again, Defendants Kohn and Manheimer hoped to create an impression that the Project was in its finishing stages and faced no major construction obstacles, misleadingly pitching the investment as a replenishment of an interest reserve due to delays caused by the Department of Buildings.  Through these deceptions, Defendants Kohn and Manheimer obtained $1 million in a Series B preferred equity funding on October 1, 2018, including a combined $300,000 from two of the Plaintiffs in this case, which they contributed through investment in a new entity, Defendant 157-159 Wythe Avenue Investors LLC.  Had these Plaintiffs known of the actual risks of default posed by these ongoing construction issues, they would not have invested in the Series B Preferred Equity.

10.      After Defendants misleadingly had reported only positive news throughout the fall of 2018, Defendants suddenly announced on January 26, 2019 that they would be offering the Property for sale with the Project unfinished in hope of avoiding foreclosure before their lender's April 1, 2019 deadline.

11.      Defendants no longer could hide the construction difficulties they misrepresented and concealed from investors.  Defendants had spent the original $1.8 million construction budget, plus a large part of the $2.2 million raised in the Series A and B preferred equity offerings, yet only had completed about 65% of the Project.  The Project's general contractor estimated that it needed another six months and somewhere between $1.5-$2.0 million to finish the Project.

12.      After convincing the lender to delay foreclosure, Defendants sold the Property in July 2019 for $8.5 million, repaying the bank debt and certain other expenses, but wiping out all Series A, Series B, and common equity investors' investments.

13.      With the Series A and Series B Preferred Equity Shares rendered worthless, Plaintiffs have lost a combined $675,000.

14.      Consequently, Plaintiffs seek damages equal to their investments, plus attorney's fees, costs, and disbursements under theories of securities fraud, common law fraudulent misrepresentation/concealment, and negligent misrepresentation/concealment.

## PARTIES

15.      Plaintiff Richard Jaffee, an individual, is domiciled in Westport, Connecticut, and is the owner of the self-directed individual retirement account known as IRA Trust Services Company CFBO Richard Jaffee, IRA #731136 (the "Richard Jaffee IRA").

16.      Plaintiff Thomas Jaffee is domiciled in Boca Raton, Florida.

17.     Plaintiff Eric Klein is domiciled in Westport, Connecticut and is the owner of the self-directed individual retirement account known as IRA Services Trust Company CFBO Eric Klein, IRA #732722.

18.     Plaintiff Steven Samuels is domiciled in Westport, Connecticut.

19.     Plaintiff Kenneth Schwartz is domiciled in Stamford, Connecticut and is the trustee of the Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz.

20.     Defendant Brooklyn Standard Properties, LLC is a limited liability company organized under the laws of the State of New York with its principal place of business at 265 Canal Street, Suite 215, New York, New York 10013.  Upon information and belief, all of its members are domiciled in New York, New York.

21.     Defendant 157-159 Wythe Avenue LLC is a limited liability company organized under the laws of the State of New York with its principal place of business at 265 Canal Street, Suite 215, New York, New York 10013.  Upon information and belief, its members are domiciled in California, Connecticut, the District of Columbia, France, Florida, Malaysia, New York, Pennsylvania, Singapore, and the United Kingdom.

22.     Defendant 157-159 Wythe Avenue Investors LLC is a limited liability company organized under the laws of the State of New York with its principal place of business at 265 Canal Street, Suite 215, New York, New York 10013.  Upon information and belief, its members are domiciled in New York and Connecticut.

23.     Upon information and belief, Defendant Benjamin Kohn is domiciled in New York, New York.

24.     Upon information and belief, Defendant David Manheimer is domiciled in New York, New York.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over Plaintiffs' federal securities claims under 15 U.S.C. § 78aa (Section 27 of the Securities Exchange Act of 1934) and 28 U.S.C. § 1331, as well as supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

26. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1), as Defendants Brooklyn Standard, 157-159 Wythe Avenue LLC, and 157-159 Wythe Avenue Investors LLC all have their principal place of business in New York, New York and, upon information and belief, Defendants Kohn and Manheimer are domiciled there.

## FACTS

27. Plaintiffs are experienced real estate investors and, among them, have invested in residential, commercial, and industrial properties around the United States.

28. Defendant Brooklyn Standard is a real estate development company founded by Defendants Kohn and Manheimer. According to its website, Defendant Brooklyn Standard "acquires and repositions properties in Brooklyn, Manhattan, and the Bronx" and seeks "low-risk buildings that are profitable in all macro-economic environments because once our renovations are done and the apartments are rented for market rates, we own the properties at a great entry point relative to the neighborhood."

29. Defendant Brooklyn Standard's website further advertises that its "properties offer an extremely unique risk/reward profile," as it is "simply purchasing an under-valued real estate asset that will appreciate in all financial market conditions" and "an increase in real estate prices is good for the investment, but if the real estate market declines," the buildings "will still provide stable returns."

7

30.     In July 2014, Mr. Samuels became aware of Defendant Brooklyn Standard's previous work and arranged a meeting for him and Mr. Richard Jaffee to discuss investment opportunities with Defendants Kohn and Manheimer.

31.     After discussions, Mr. Samuels and Mr. Richard Jaffee made an equity investment in a renovation project that Brooklyn Standard was planning for a building on West 107th Street in Manhattan, which is ongoing.

**The Formation of 157-159 Wythe Avenue LLC and the Initial Financing and Commencement of the Project**

32.     At some point before August 2015, Defendant Brooklyn Standard became interested in acquiring the property at 157-159 Wythe Avenue in the Williamsburg neighborhood of Brooklyn (the "Property"), with the goal of renovating and expanding the existing building on the Property into a four-story building with both residential and commercial space (the "Project"), which it then would sell once the Project was completed.

33.     In around August 2015, Defendant Brooklyn Standard formed Defendant 157-159 Wythe Avenue LLC, a single-purpose entity created to acquire, manage, and develop the Property.

34.     At the formation of Defendant 157-159 Wythe Avenue LLC, Defendant Brooklyn Standard was appointed managing member, a position it continuously has held to date. Defendant 157-159 Wythe Avenue LLC's Operating Agreement states that Defendant Brooklyn Standard is authorized to act as managing member through its own authorized managers, Defendants Manheimer and Kohn, positions they continuously have held to date.

35.     Under the 157-159 Wythe Avenue LLC Operating Agreement, Defendant Brooklyn Standard, as managing member had the "power, in its sole discretion, to make any and

8

all decisions regarding the operations of the Company and the ownership, management, and development of the Property." (Section 5.1).

36.     In around late 2015, Defendant Brooklyn Standard negotiated a purchase price of $8 million for the Property.

37.     In around late 2015, Defendant Brooklyn Standard solicited bids from general contractors for the Project.  The winning general contractor's estimate for its work on the Project was $1.4 million, a bid that was only about $100,000 lower than the next-lowest bidders.  By agreement, the budget for the project was raised to $1.8 million shortly thereafter.

38.     To fund the purchase of the Property, Defendant Brooklyn Standard arranged in around late 2015 for Defendant 157-159 Wythe Avenue LLC to take an $8,434,000 loan with 6.15% annual interest payable from real estate lender Ready Capital ("ReadyCap"), with the Property as collateral (the "ReadyCap Loan").  The ReadyCap Loan required monthly interest payments.

39.     As the objective was to pay back the principal of the loan with the proceeds from the sale of the Property, it was understood that interest would continue to accrue until the Property was sold, or until ReadyCap foreclosed on the Property because of a default.

40.     In around late 2015, Defendant Brooklyn Standard also raised $3.082 million for the Project by arranging for Defendant 157-159 Wythe Avenue LLC to sell common equity at $1,000 per unit.  Each common equity holder also became a non-managing member of 157-159 Wythe Avenue LLC and subscribed to its Operating Agreement.

41.     The proceeds from the common equity round of funding were to be used to pay the costs of construction and to reserve for the interest accruing on the ReadyCap Loan.

42.     On or about December 7, 2015, Defendant 157-159 Wythe Avenue LLC finalized its purchase of the Property for the agreed sale price of $8 million.

43.     Subsequently, the general contractor that Defendant Brooklyn Standard had hired for the Project commenced work on the Property.

44.     The success of the Project depended on the ability to sell the Property for a greater amount than the sum of all loans, accrued interest, and equity investments, so that equity holders (which included Defendant Brooklyn Standard) would recoup their investment and realize a profit.

45.     The ultimate unfavorable outcome for equity investors would occur if increased construction costs and/or accruing interest from delays caused Defendant 157-159 Wythe Avenue LLC to run out of money before completing the Project.  This would result in either (1) ReadyCap's foreclosure on the Property, which would cause equity holders to lose their entire investment or (2) 157-159 Wythe Avenue LLC's sale the Property at a discount price to avoid foreclosure, which would leave equity holders with either a partial or total loss, depending on the sale price.

46.     Therefore, any turn of events that threatened material increases to construction costs and/or material delays of the project posed a material risk to the success of the Project.

**The Solicitation and Sale of the Series A Preferred Equity Shares**

47.     At the beginning of April 2017, the Project was still in progress but was facing financial strain.  Among other issues, Defendants Brooklyn Standard, 157-159 Wythe Avenue, Kohn, and Manheimer (the "Series A Defendants") had expanded the Project beyond its original scope and now planned to create a basement with 1,500 square feet of rentable retail space.

48.     The excavation of the basement and construction of the foundation, however, had proven significantly more difficult than originally anticipated.  After excavation of the basement began in or before February 2017, the Series A Defendants became aware that the underground area in the rear of the Property consisted of bedrock and large boulders.  As the Property is in a crowded urban area directly next to other buildings, explosives were not an option.

49.     Aware that the excavation of the basement was a slow, laborious, and costly process that put the Project behind schedule, the Series A Defendants determined by the beginning of April 2017 that they would have to raise an additional $1.2 million.  The Series A Defendants decided to raise these funds by issuing preferred equity shares[1] in Defendant 157-159 Wythe Avenue LLC, designated as Series A (the "Series A Preferred Equity Shares"), which would not be registered with the Securities and Exchange Commission and would be offered to accredited investors in a private placement.

50.     The Series A Preferred Equity Shares would be subordinate to ReadyCap's Loan, but senior to the common equity shares.

51.     The Series A Preferred Equity Shares were to provide a return of 12% per year, accruing monthly and payable upon sale of the Property if there were sufficient funds left over after satisfying the ReadyCap Loan.  If the sale, however, took place at any time within 10 months of investment, investors would receive an absolute 10% return on their investment if there were sufficient funds left over after satisfying the ReadyCap Loan.  If the sale had not

---

[1]     Preferred equity investments generally are less risky than common equity investments, as they incorporate certain features of debt investments to mitigate risk.  As preferred equity generally receive a fixed, periodic sum (called a coupon), they do not have the unlimited upside of common equity but have the right to receive their fixed payment before common equity holders have the right to receive their profit share.  Preferred equity holders, however, still are subordinate to debt holders and receive no contractual promise that their investment will be repaid by the company.  Therefore, to attract investors, issuers of preferred equity generally must offer a higher rate of return than the interest rate paid to debtholders.

taken place within 18 months of investment, however, the return would begin to accrue monthly at a rate of 15% per year.

52.    The obstacles posed by the excavation of the basement and construction of the foundation put the Series A Defendants in a bind.  To keep the project going, they would need to attract additional investors, but the increased costs and risks of delay made a preferred equity investment in the Project inherently less attractive because of its limited upside in comparison to the risks.

53.    Therefore, the Series A Defendants decided to conceal these problems from potential investors and disguise their reasons for raising additional funds, claiming that they primarily needed to replenish the interest reserve merely because of delays from the Department of Buildings.  Delays caused by "paper problems" with the Department of Buildings are inherently less concerning than construction problems and the Series A Defendants knew that such characterizations would make the Series A Preferred Shares more attractive to potential investors than if they told the truth.

54.    In around the beginning of April 2017, Defendant 157-159 Wythe Avenue, through its managing member Brooklyn Standard, began soliciting investors for the Series A Preferred Equity Shares, including Mr. Richard Jaffee and Mr. Samuels, who previously had invested in Defendant Brooklyn Standard's project on West 107th Street in Manhattan.

55.    On April 4, 2017, in emails he sent separately to Mr. Richard Jaffee and Mr. Samuels, Defendant Kohn explained 157-159 Wythe Avenue LLC's capital structure and the potential return of the Series A Preferred Equity Shares and stated that he thought there would be a "finished building in 9 month[s] but to be on the safe side[,] we would want to borrow enough money that gives us 18 months of runway."

56.     Defendant Kohn also stated that he thought the building would sell for between $16.25 and $18 million and that Series A Preferred Equity Investors' "maximum exposure is a building value of up to $10M," meaning that, based on projected debts and expenses, Series A Preferred Equity Investors would realize their expected return if the building sold for over $10 million.

57.     Although he knew that the real reason for raising funds was to complete the difficult and expensive tasks of excavating the basement and constructing the foundation, Defendant Kohn misleadingly stated that "[w]e need the majority of the money because the project has gone longer than expected because of delays with the Department of Buildings (DOB) and our interest reserve is about to run out."

58.     Although he knew the costs and delays associated with excavating the basement and constructing the foundation were significant and threatened the economic viability of the entire Project, Defendant Kohn also misleadingly stated that "we will use a small amount of the funds for small cost overruns," that the "cost over runs ha[ve] been the cost of adding additional value to the buildings that were not part of our original plans" and the "[w]e were approved to and are currently in the process of digging out the basement to make a rentable basement (originally we were not touching the basement)."

59.     Defendant Kohn assured Mr. Samuels and Mr. Richard Jaffee in writing that the increased value of the building from a rentable basement and adding more rentable square footage on the fourth floor would offset the costs associated with the DOB delays, without acknowledging the time-consuming, difficult, and expensive excavation that had been underway since on or before February 2017.

60.     Defendant Kohn made these misrepresentations intending not only for Mr. Richard Jaffee and Mr. Samuels to rely on them, but also intending for any other investor that Mr. Richard Jaffee and Mr. Samuels recruited to rely on them as well.

61.     Based on the context and nature of Defendant Kohn's misrepresentations, Mr. Richard Jaffee and Mr. Samuels reasonably believed the Series A Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan and that most of the remaining construction costs would be covered by money already raised through the common equity round.

62.     Further, as the Project was in progress and Defendant Kohn projected that the Project would be completed within the relatively short time frame of nine months without mentioning any major foreseeable construction-related risks, Mr. Richard Jaffee and Mr. Samuels reasonably concluded that the Project was in its later stages and there were no major foreseeable construction-related risks.

63.     Believing that a 12% return was appropriate based on their understanding of the risk, Mr. Richard Jaffee and Mr. Samuels believed they had found a suitable, conservative, late-stage investment and discussed the Series A Preferred Equity with Richard's brother, Thomas Jaffee, and their friend, Eric Klein, sharing the information Defendant Kohn had provided.

64.     The general contractor's lack of experience led to errors in constructing the foundation that needed to be rectified, including inconsistent sloping, improper installation of rebar, and failure to comply with building code.  At some point between April and June 7, 2017, the Series A Defendants were aware that the general contractor had made errors that would require expensive and time-consuming corrective work.

14

65.     Although Mr. Thomas Jaffee and Mr. Klein also were accredited investors with experience in real estate investments, they did not invest as frequently or make investments of the same magnitude as Mr. Richard Jaffee or Mr. Samuels.

66.     Therefore, Mr. Richard Jaffee sent Defendant Kohn an email on May 31, 2017, stating that "[t]his investment is significant to my brother and Eric. Please assure me that this is an appropriate, conservative investment for them."

67.     Defendant Kohn replied that "This is definitely a conservative investment. We feel very confident about the equity for this deal so a lot would have to go wrong for the equity to be wiped out completely and for this pref[erred equity] to have an issue."

68.     At this time, however, Defendant Kohn knew his statement that the Series A Preferred Equity was "definitely a conservative investment" was misleading because he had not disclosed the increased costs and risk of delay posed by the excavation of the basement and construction of the foundation.

69.     In early June 2017, structural engineer Philip Couvillion visited the Property and became aware of various errors and inconsistencies in the excavation and foundation-building work. Although the original plan when the excavation began in February 2017 was a sloped excavation with several box pit excavations, Mr. Couvillion noticed that the sloping was inconsistent, the rebar had been installed improperly, and the installation did not comply with the building code.

70.     Mr. Couvillion determined that the work needed correction and notified the Series A Defendants. Although the Series A Defendants previously were aware of the need for corrective work and certainly were aware after speaking with Mr. Couvillion, they said nothing

to Mr. Samuels, Mr. Klein, Mr. Richard Jaffee, or Mr. Thomas Jaffee, even though the deal for

the Series A Preferred Equity was about to close.

71.    The Series A Preferred Equity was offered at $1,000 per unit.

72.    On or about June 7, 2017, Mr. Richard Jaffee, Mr. Thomas Jaffee, Mr. Klein, and

Mr. Samuels (collectively, the "Series A Plaintiffs"), all relying on the misstatements and

omissions by the Series A Defendants, invested in the Series A Preferred Equity as follows:

    a.    Mr. Richard Jaffee, in his capacity as owner of the IRA Services Trust Company

        CFBO Richard Jaffee, IRA #731316 (the "Richard Jaffee IRA") purchased 100

        units for $100,000;

    b.    Mr. Thomas Jaffee purchased 75 units for $75,000;

    c.    Mr. Klein, in his capacity as owner of IRA Services Trust Company CFBO Eric

        Klein, IRA #732722l, purchased 100 units for $100,000; and

    d.    Mr. Samuels purchased 100 units for $100,000.

73.    Had the Series A Plaintiffs known that the delays were caused primarily by the

expensive and time-consuming excavation of the basement and building of the foundation, rather

than "paper problems" with the DOB, they would not have invested in the Series A Preferred

Securities.  The threats of delay and cost overruns far outweighed the limited potential return of

12%, especially since the Series A Plaintiffs could have purchased common equity in a project of

similar actual risk and at least have had the potential for more unrestricted upside.

**Relevant Portions of Agreements Related to the Series A Preferred Equity Shares**

74.    As a condition of their investment, each of the Series A Plaintiffs signed a

Subscription Agreement and Investment Agreement on June 7, 2017.  Paragraph 4(c) of the

Investment Agreement for the Series A Preferred Shares provides that:

16

In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

75.    Each Series A Plaintiff also signed a Joinder Agreement on June 8, 2017, by which they accepted the 157-159 Wythe Avenue LLC Operating Agreement, as amended, and became non-managing members of 157-159 Wythe Avenue LLC.

76.    Following each Series A Plaintiff's admission to a non-managing membership 157-159 Wythe Avenue LLC, Defendants Brooklyn Standard, through its managers Defendants Kohn and Manheimer, owed each Series A Plaintiff fiduciary duties of loyalty, care, and disclosure.

**Events Leading to the Solicitation and Sale of the Series B Preferred Equity Shares**

77.    At some point between the issuance of the Series A Preferred Shares and the middle of 2018, Defendant Brooklyn Standard decided to stop the expensive and time-consuming construction of a basement that could provide rentable retail space.  This left the basement with a bifurcated space with significantly less area than the previously planned additional 1,500 square feet of commercial rental space.  Also, as the basement only had six-foot ceilings in some areas and eight-foot ceilings in other areas, the basement could not be used as rentable retail space and would be useful only as storage space to a ground-floor tenant.  These changes diminished the basement's value and, consequently, the building's value.

78.    As the Project progressed through 2017 into mid-2018, however, the Series A Defendants made no mention of any changes of plans concerning the basement, nor did they reveal any other construction-related issues that significantly would increase the costs of the

17

Project or delay its completion.  Rather, their communications with investors generally were optimistic or nondescript.

79.     On September 15, 2017, Defendant Kohn stated in an email to the Series A Plaintiffs that "[t]hings are going well," "[w]e've started to pour the cement for the basement," and "we [are] on pace to be done in around 9 months from now."

80.     On October 16, 2017, Defendant Kohn wrote that "we have crossed a major hurdle and poured the concrete for the rear extension" and that the "work in the yard was very labor intensive, and now that it is complete, we can move at full-speed and build out the commercial space and residential units above."  This was the first mention to investors that the yard work had been labor-intensive.

81.     On February 5, 2018, Defendant Brooklyn Standard issued a formal investor letter for 157-159 Wythe Avenue LLC, which generally stated that the Project was progressing and did not suggest any construction issues that required additional funds, threatened the value of the Property, or posed delays that ReadyCap would not abide.

82.     The February 2018 investor letter attributed the delays in construction to "delays at the Department of Buildings (DOB) during our approval process" and "unforeseen construction delays from working in a tight area on an older building" but stated that '[w]hile the delays have cost us time and money, we have been able to offset those expenses by growing the project," referencing their plan for a rentable basement and increased rentable space on the fourth floor.  The report also discussed the apparent need for issuing the Series A Preferred Shares, stating that "[g]iven the DOB and construction delays, we have needed to raise some additional funds" and "have raised a pref-equity tranche to help fund our ongoing debt service."

The letter further reported that the ReadyCap Loan had been renegotiated to "extend the interest only portion of the loan."

83.    A shorter investor letter in April 2018 also reported progress and stated that Defendant Brooklyn Standard had "brought on an outside contractor as an adviser to help us better anticipate unexpected issues and sure that we do not have further delays."

84.    On July 3, 2018, however, following up on a call with Mr. Samuels and Mr. Richard Jaffee, Defendant Kohn, in his capacity as manager of Defendant Brooklyn Standard in its capacity of managing member of 157-159 Wythe Avenue LLC, wrote to the Series A Plaintiffs that the Project required another round of preferred equity investment, which eventually would be designated "Series B Preferred Equity Shares."

85.    Once again, Defendants Brooklyn Standard, Kohn, Manheimer, and 157-159 Wythe Avenue LLC knew that it would be easier to attract investment from people who already had invested in the Project if they explained the need for funds as an unlucky delay from the DOB rather than admitting that the funds would be used to address the significant cost overruns resulting from the construction complications that continuously plagued the project, including the difficulty with the basement excavation and construction of the foundation, as well as other complications whose full extent and true nature are still not yet known to date.

86.    According to Defendant Kohn, "we were extremely unlucky and received a stop work order from the DOB" because "our neighbor called in a minor violation regarding the protection of his roof" and then "the DOB inspector didn't like the format with which our engineer had been doing his structural engineering drawings[,] as the engineer made adjustments regarding the on site conditions."

87.    Defendant Kohn further wrote that "[w]hat our engineer did was standard but the DOB has a lot of power and can basically do as they please.  So the stop work order remains because the DOB inspector also put us into an engineering audit and this has taken some time." " To be clear," wrote Defendant Kohn, "our engineering drawings and their execution were always done properly from an engineering and safety standpoint" and "[e]verything we have received from the DOB is in regard to their being unhappy with the formatting of the docs but the work itself has not been an issue."  Defendant Kohn also wrote, "[we] want you to know the safety of the building is not and has not been called into question."

88.    Defendant Kohn then wrote that "[t]hese delays mean that we had to go back to our bank and get an extension," which "means that we need to raise additional funds to refill our interest reserve through completion.  We need to raise an additional 750k for our bank."

89.    Defendant Kohn, however, knowingly did not mention that the real reason for raising these funds was to address the significant cost overruns resulting from the construction complications that continuously plagued the project, including the basement excavation errors and other complications whose full extent and true nature are still not yet known to date.

90.    In soliciting the new round of funding, Defendant Kohn also stated that "[w]e apologize this did not go as promised, but your investments remain very safe.  Rich[,] I know you have people very close to you in this deal and you should not worry.  The ultimate value of the building has not taken any hit.  This additional raise means that your breakeven point is still below 11M and we expect to sell the building when completed for 16M or more (16M to 18M)."

91.    Defendant Kohn, however, knew that the value of the building had decreased because the basement no longer was available as rentable retail space.  Defendant also knew that

the Williamsburg real estate market was past its peak and the Property would not be able to sell for over $16 million without the additional rentable retail space.

92.      Again, Defendant Kohn knew it would be easier to obtain funding from people who already had invested the Project if he misled them into believing that he merely was seeking an interest reserve and that the fundamentals of the Project had not changed.

93.      Defendant Kohn made these misrepresentations intending not only that the Series A Plaintiffs would rely on them, but also that any new investors the Series A Plaintiffs recruited would rely on them as well.

94.      Based on his misrepresentations, Defendant Kohn continued to create the impression that this was a "paper problem" rather than a construction problem, again leading Mr. Richard Jaffee reasonably to believe that there were no major foreseeable construction-related risks threatening the project, and that the remaining construction costs would be covered by money already raised through the common equity round and Series A financing.

95.      Believing he had adequate understanding of the state of the project, Mr. Richard Jaffee recruited his friend and fellow real estate investor, Plaintiff Kenneth Schwartz, to invest in the Series B Preferred Equity round.  Reasonably relying on the representations given to the Series A Plaintiffs about the Project, Mr. Schwartz had the same reasonable understandings as Mr. Richard Jaffee.

96.      The DOB approved the revised engineering plans on July 25, 2018 and work recommenced in August.

97.      At ReadyCap's request, the Series B Preferred Equity round was structured so that 157-159 Wythe Avenue LLC would issue the Series B Preferred Equity Shares to a new entity, 157-159 Wythe Avenue Investors LLC, whose sole purpose was to hold these shares.  The

Series B investors then would purchase common equity in 157-159 Wythe Avenue Investors LLC.

98.    The Series B Preferred Equity Shares, which were subordinate to the Series A Preferred Equity Shares, were to provide a return of 15% per year, accruing monthly and payable upon sale of the Property if there were sufficient funds left over after satisfying the ReadyCap Loan and the Series A Preferred Equity Shares. If the sale had not taken place within 18 months of investment, however, the return would begin to accrue monthly at a rate of 18% per year.

99.    The Series B Preferred Equity was offered at $1,000 per unit and, in turn, units in 157-159 Wythe Avenue Investors LLC were offered at $1,000 per unit. In total, $1 million was raised through the Series B round of funding.

100.    On or about October 1, 2018 Mr. Richard Jaffee and Mr. Schwartz (collectively, the "Series B Plaintiffs") invested in shares in 157-159 Wythe Avenue Investors LLC as follows:

    a.    Mr. Richard Jaffee purchased 150 units for $150,000;

    b.    Mr. Schwartz, in his capacity as trustee of the Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz, purchased 150 units for $150,000; and

101.    At the time the Series B Plaintiffs invested, neither Defendants Brooklyn Standard, Kohn, Manheimer, 157-159 Wythe Avenue LLC, or 157-159 Wythe Avenue Investors LLC (the "Series B Defendants") revealed any construction problems facing the project, despite Defendant Kohn's previous misstatements.

102.    Had the Series B Plaintiffs known about the risks posed by undisclosed construction problems, as well as the lack of rentable commercial space in the basement, they would not have invested in the 157-159 Wythe Avenue Investors LLC., as the threats of delay and cost overruns far outweighed the limited potential return of 15% for an investment that was

subordinated to another round of preferred equity, especially since the Series B Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

**Relevant Portions of Agreements Related to the Series B Round of Funding**

103.    As a condition of their investment, each of the Series B Plaintiffs signed a Subscription Agreement and Investment Agreement on October 1, 2018.  Paragraph 4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC provides that:

> In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

104.    Each Series B Plaintiff also signed a Joinder Agreement on October 1, 2018, by which they accepted the 157-159 Wythe Avenue LLC Investors Operating Agreement, as amended and became non-managing members of 157-159 Wythe Avenue Investors LLC.

105.    Following each Series B Plaintiff's admission to a non-managing membership 157-159 Wythe Avenue LLC, Defendants Brooklyn Standard, through its managers Defendants Kohn and Manheimer, owed each Series B Plaintiff fiduciary duties of loyalty, care, and disclosure.

**After Positive Reports in the Fall of 2018, the Project Unravels in January 2019**

106.    Following the Series B round of funding, Defendant Brooklyn Standard began providing regular updates that were exclusively positive in tone.

107.    On November 1, 2018, Defendant Manheimer wrote to Mr. Richard Jaffee that "[w]e are making great progress with renovations" and "[t]hings are on track as previously planned."

108.    On December 8, 2018, Defendant Brooklyn Standard issued an investor report stating that, among other things, concrete, foundation, steel, and masonry work had been completed, as had the roof on fourth floor.  The report also stated that electrical work and plumbing were more than half completed, that duct and HVAC work had begun, and that construction now was expected to finish in the first quarter of 2019.

109.    Then, without any warning, Defendant Kohn emailed Mr. Richard Jaffee on January 26, 2019 with an "urgent update" that, "[e]ffective immediately, we are going to list the property for sale."  Defendant Kohn stated that "[w]e are listing the building now because we do not feel we will be able to have the building complete in time for the bank's extension deadline, which is April 1, 2019."  According to Defendant Kohn, the "impetus for all this is that we were given an unexpected revised new budget and timetable by our contractor that jeopardizes the April 1 deadline."

110.    Defendant Kohn's January 26 email shifted blame to the contractor, stating that [r]ecently our contractor approached us with a revised budget and his numbers to complete the project increased dramatically" and his "timetable to completion had also changed."  Defendant Kohn also wrote that the agreement with the contractor was "based on a lump sum contract, so he is required to deliver the finished building in a set timeframe and any overages are his responsibility" but the contractor "is now effectively telling us he cannot deliver the building on time and does not have the means to cover the overages."  According to Defendant Kohn, "it is now apparent we were misled and given unreliable information by our contractor and architects and it is why we are in the position."

111.    Plaintiffs later learned that, as of January 2019, the Project only was about 65%
finished and that the contractor had stated that completing the project would take at least another
$1.5 million.

112.    As raising another round of equity likely would outstrip the expected sale price of
the Property, Defendant Kohn stated that the only other option to avoid foreclosure was to sell
the Property.  Because of the unattractive investment proposition, no current investor was willing
to make any additional investment.

113.    The risks posed by known construction complications, which Defendant Brooklyn
Standard and its principals misrepresented and concealed from Plaintiffs through two rounds of
preferred equity funding, had now materialized.  Plaintiffs still are unaware of the full extent of
construction complications facing the Project that Defendants knew about and concealed at the
time of the Series A and Series B fundings.

114.    On January 28, 2019, Mr. Richard Jaffee spoke to Jaime Schultz, the leasing
agent who had been soliciting potential renters for the building on the Property.

115.    Ms. Schultz stated that Defendant Brooklyn Standard and its principals knew at
least six months before that the contractor was the "wrong guy" but had ignored
recommendations to fire him.  She also stated that the plans for a basement with rentable retail
space long had been abandoned and described the feasibility and ceiling-height limitations that
had prevented Defendant Brooklyn Standard from realizing its plan for a basement with rentable
retail or commercial space.  This was the first time that any Plaintiff learned that the plans for the
basement had been changed and no longer included 1,500 square feet of rentable retail or
commercial space.

116.    Beginning in the winter of 2019, Defendants listed the property for sale in its unfinished state and convinced ReadyCap to refrain from foreclosing while they sought a buyer. Finally, in July 2019, the Property was sold for $8.5 million, which was enough to repay the debt to ReadyCap and cover certain expenses, but wiped out all Series A, Series B, and common equity investors' investments.

117.    With the Series A and Series B Preferred Equity Shares rendered worthless, Plaintiffs have lost a combined $675,000.

**FIRST CLAIM**
**By the Series A Plaintiffs against the Series A Defendants**
**(Securities Fraud under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5)**

118.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 116 of this Complaint, as if set forth at length herein.

119.    Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the following misleading statements while soliciting investment in the Series A Preferred Shares:

      a.    April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels:  "We need the majority of the money because the project has gone longer than expected because of delays with the Department of Buildings (DOB) and our interest reserve is about to run out."

      b.    April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels: "We will use a small amount of the funds for small cost overruns," that the "cost over runs ha[ve] been the cost of adding additional value to the buildings that were not part of our original plans" and the "[w]e were approved to and are currently in the process of

digging out the basement to make a rentable basement (originally we were not

touching the basement)."

    c.   May 31, 2017 to Mr. Richard Jaffee: "This is definitely a conservative

investment.  We feel very confident about the equity for this deal so a lot would

have to go wrong for the equity to be wiped out completely and for this pref to

have an issue."

120.    These statements were misleading or rendered misleading before the Series A

Plaintiffs invested, because the Series A Defendants' real reason for raising funds was to

complete the difficult and expensive tasks of excavating the basement and constructing the

foundation, which posed significant costs and delays that threatened the economic viability of the

entire Project, and Defendant Kohn's characterization of the Series A Preferred Shares as a

"conservative investment" concealed the risks posed by undisclosed complications with

excavation of the basement and construction of the foundation.

121.    Before the Series A Plaintiffs invested on June 7, 2017, the Series A Defendants

deliberately failed to correct the misstatements made by Defendant Kohn or disclose the truth

concealed by Defendant Kohn's misstatements.

122.    These statements and omissions were material because, had the Series A Plaintiffs

known about the risks posed by the problems with excavating the basement and building the

foundation, they would not have invested in the Series A Preferred Securities, as the threats of

delay and cost overruns far outweighed the limited potential return of 12%, especially since the

Series A Plaintiffs could have purchased common equity in a project of similar actual risk and at

least have had the potential for more unrestricted upside.

123.    These statements and omissions were made with scienter because the Series A Plaintiffs knew that it would be easier to attract investors if they attributed their need for additional funding to replenishing their interest reserve after delays from the Department of Buildings, rather than major cost overruns required to complete a difficult and expensive basement excavation and construction.  Therefore, they deliberately chose to misrepresent and conceal the true state of the Project.

124.    These statements and omissions were made in connection with the purchase and sale of securities because they were made with the intention of inducing Mr. Richard Jaffee and Mr. Samuels, as well as any other investors they recruited, to purchase the Series A Preferred Shares.

125.    Reasonably relying on the Series A Defendants' misrepresentations and omissions, the Series A Defendants concluded that a return of 12% was reasonable considering that the Series A Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

126.    On or about June 7, 2017, the Series A Plaintiffs, all reasonably relying on the misstatements and omissions by the Series A Defendants, invested in the Series A Preferred Equity as follows:

   a.    Mr. Richard Jaffee, in his capacity as owner of the IRA Services Trust Company CFBO Richard Jaffee, IRA #731316 (the "Richard Jaffee IRA") purchased 100 units for $100,000;

   b.    Mr. Thomas Jaffee purchased 75 units for $75,000;

    c.   Mr. Klein, in his capacity as owner of IRA Services Trust Company CFBO Eric

        Klein, IRA #732722l, purchased 100 units for $100,000; and

    d.   Mr. Samuels purchased 100 units for $100,000.

127.    The Series A Preferred Shares are worthless, as the Project ran out of money and Defendants were forced to sell the Property in its unfinished state for a sale price below the amount necessary for any Series A Plaintiff to recoup any of his investment.

128.    The Series A Plaintiffs' losses were caused by the materialization of the risk misrepresented and concealed by the Series A Defendants, namely that cost overruns and delays from known construction problems would cause the Project to run out of money before completion.

129.    As a result of the Series A Defendants' fraudulent inducement of the Series A Plaintiffs' investments, the Series A Defendants are jointly and severally liable to each Series A Plaintiff for the amount of his investment in the Series A Preferred Shares, as well as attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares.

## SECOND CLAIM
### By the Series A Plaintiffs against the Series A Defendants
### (Common Law Fraudulent Inducement/Fraudulent Concealment)

130.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 128 of this Complaint, as if set forth at length herein.

131.    Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the following misleading statements while soliciting investment in the Series A Preferred Shares:

a.  April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels:  "We need the majority of the money because the project has gone longer than expected because of delays with the Department of Buildings (DOB) and our interest reserve is about to run out."

b.  April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels: "We will use a small amount of the funds for small cost overruns," that the "cost over runs ha[ve] been the cost of adding additional value to the buildings that were not part of our original plans" and the "[w]e were approved to and are currently in the process of digging out the basement to make a rentable basement (originally we were not touching the basement)."

c.  May 31, 2017 to Mr. Richard Jaffee:  "This is definitely a conservative investment.  We feel very confident about the equity for this deal so a lot would have to go wrong for the equity to be wiped out completely and for this pref to have an issue."

132.    These statements were misleading or rendered misleading before the Series A Plaintiffs invested, because the Series A Defendants' real reason for raising funds was to complete the difficult and expensive tasks of excavating the basement and constructing the foundation, which posed significant costs and delays that threatened the economic viability of the entire Project, and Defendant Kohn's characterization of the Series A Preferred Shares as a "conservative investment" concealed the risks posed by undisclosed complications with excavation of the basement and construction of the foundation.

133.    Before the Series A Plaintiffs invested on June 7, 2017, the Series A Defendants deliberately failed to correct the misstatements made by Mr. Kohn or disclose the truth concealed by Mr. Kohn's misstatements.

134.    The Series A Defendants had a duty to speak because they had superior knowledge the aforementioned issues, such knowledge was not readily available to the Series A Plaintiffs, and the Series A Defendants knew that the Series A Plaintiffs were investing in the Series A Preferred Shares on the basis of mistaken knowledge.

135.    The Series A Defendants also had a duty to speak because Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the aforementioned misleading statements while soliciting investment in the Series A Preferred Shares.

136.    These statements and omissions were material because, had the Series A Plaintiffs known about the risks posed by the problems with excavating the basement and building the foundation, they would not have invested in the Series A Preferred Securities, as the threats of delay and cost overruns far outweighed the limited potential return of 12%, especially since the Series A Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

137.    These statements and omissions were made with scienter because the Series A Plaintiffs knew that it would be easier to attract investors if they attributed their need for additional funding to replenishing their interest reserve after delays from the Department of Buildings, rather than major cost overruns required to complete a difficult and expensive

basement excavation and construction.  Therefore, they deliberately chose to misrepresent and conceal the true state of the project.

138.    These misrepresentations and omissions were made with the intent to induce reliance because the Series A Defendants made them with the intention of inducing Mr. Richard Jaffee and Mr. Samuels, as well as any other investors they recruited, to purchase the Series A Preferred Shares.

139.    Reasonably relying on the Series A Defendants' misrepresentations and omissions, the Series A Defendants concluded that a return of 12% was reasonable considering that the Series A Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

140.    On or about June 7, 2017, Mr. Richard Jaffee, and Mr. Thomas Jaffee, Mr. Klein, and Mr. Samuels (collectively, the "Series A Plaintiffs"), all reasonably relying on the misstatements and omissions by the Series A Defendants, invested in the Series A Preferred Equity as follows:

      a.   Mr. Richard Jaffee, in his capacity as owner of the IRA Services Trust Company CFBO Richard Jaffee, IRA #731316 (the "Richard Jaffee IRA") purchased 100 units for $100,000;

      b.   Thomas Jaffee purchased 75 units for $75,000;

      c.   Mr. Klein, in his capacity as owner of IRA Services Trust Company CFBO Eric Klein, IRA #732722l, purchased 100 units for $100,000; and

      d.   Mr. Samuels purchased 100 units for $100,000.

141.     The Series A Preferred Shares are worthless, as the Project ran out of money and Defendants were forced to sell the Property in its unfinished state for a sale price below the amount necessary for any Series A Plaintiff to recoup any of his investment.

142.     The Series A Plaintiffs' losses were caused by the materialization of the risk misrepresented and concealed by the Series A Defendants, namely that cost overruns and delays from known construction problems would cause the Project to run out of money before completion.

143.     As a result of the Series A Defendants' fraudulent inducement of the Series A Plaintiffs' investments, the Series A Defendants are jointly and severally liable to each Series A Plaintiff for the amount of his investment in the Series A Preferred Shares, as well as attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares.

**THIRD CLAIM**
**By the Series A Plaintiffs against the Series A Defendants**
**(Negligent Misrepresentation/Omission)**

144.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 142 of this Complaint, as if set forth at length herein.

145.     Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the following misleading statements while soliciting investment in the Series A Preferred Shares:

a.     April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels:  "We need the majority of the money because the project has gone longer than expected because of delays with the Department of Buildings (DOB) and our interest reserve is about to run out."

b.      April 4, 2017 to Mr. Richard Jaffee and Mr. Samuels: "We will use a small amount of the funds for small cost overruns," that the "cost over runs ha[ve] been the cost of adding additional value to the buildings that were not part of our original plans" and the "[w]e were approved to and are currently in the process of digging out the basement to make a rentable basement (originally we were not touching the basement)."

c.      May 31, 2017 to Mr. Richard Jaffee:  "This is definitely a conservative investment.  We feel very confident about the equity for this deal so a lot would have to go wrong for the equity to be wiped out completely and for this pref to have an issue."

146.    These statements were misleading or rendered misleading before the Series A Plaintiffs invested, because the Series A Defendants' real reason for raising funds was to complete the difficult and expensive tasks of excavating the basement and constructing the foundation, which posed significant costs and delays that threatened the economic viability of the entire Project, and Defendant Kohn's characterization of the Series A Preferred Shares as a "conservative investment" concealed the risks posed by undisclosed complications with excavation of the basement and construction of the foundation.

147.    Before the Series A Plaintiffs invested on June 7, 2017, the Series A Defendants deliberately failed to correct the misstatements made by Mr. Kohn or disclose the truth concealed by Mr. Kohn's misstatements.

148.    The Series A Defendants had a duty to speak because they had superior knowledge the aforementioned issues, such knowledge was not readily available to the Series A Plaintiffs, and the Series A Defendants knew that the Series A Plaintiffs were investing in the Series A Preferred Shares on the basis of mistaken knowledge.

149.     The Series A Defendants also had a duty to speak because Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the aforementioned misleading statements while soliciting investment in the Series A Preferred Shares.

150.     These statements and omissions were material because, had the Series A Plaintiffs known about the risks posed by the problems with excavating the basement and building the foundation, they would not have invested in the Series A Preferred Securities, as the threats of delay and cost overruns far outweighed the limited potential return of 12%, especially since the Series A Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

151.     These misrepresentations and omissions were made with the intent to induce reliance because the Series A Defendants made them with the intention of inducing Mr. Richard Jaffee and Mr. Samuels, as well as any other investors they recruited, to purchase the Series A Preferred Shares.

152.     The Series A Defendants should have known that these misrepresentations and omissions were misleading and erroneously would lead the Series A Plaintiffs to conclude that the Series A Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

153.     Reasonably relying on the Series A Defendants' misrepresentations and omissions, the Series A Defendants concluded that a return of 12% was reasonable considering

35

that the Series A Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

154.    On or about June 7, 2017, Mr. Richard Jaffee, and Mr. Thomas Jaffee, Mr. Klein, and Mr. Samuels (collectively, the "Series A Plaintiffs"), all reasonably relying on the misstatements and omissions by the Series A Defendants, invested in the Series A Preferred Equity as follows:

        a.    Mr. Richard Jaffee, in his capacity as owner of the IRA Services Trust Company CFBO Richard Jaffee, IRA #731316 (the "Richard Jaffee IRA") purchased 100 units for $100,000;

        b.    Thomas Jaffee purchased 75 units for $75,000;

        c.    Mr. Klein, in his capacity as owner of IRA Services Trust Company CFBO Eric Klein, IRA #732722l, purchased 100 units for $100,000; and

        d.    Mr. Samuels purchased 100 units for $100,000.

155.    The Series A Preferred Shares are worthless, as the Project ran out of money and Defendants were forced to sell the Property in its unfinished state for a sale price below the amount necessary for any Series A Plaintiff to recoup any of his investment.

156.    The Series A Plaintiffs' losses were caused by the materialization of the risk misrepresented and concealed by the Series A Defendants, namely that cost overruns and delays from known construction problems would cause the Project to run out of money before completion.

157.     As a result of the Series A Defendants' negligent inducement of the Series A

Plaintiffs' investments, the Series A Defendants are jointly and severally liable to each Series A

Plaintiff for the amount of his investment in the Series A Preferred Shares, as well as attorney's

fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the

Investment Agreement for the Series A Preferred Shares.

**FOURTH CLAIM**
**By the Series B Plaintiffs against the Series B Defendants**
**(Securities Fraud under Section 10(b) of the Securities Exchange Act of 1934)**

158.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

156 of this Complaint, as if set forth at length herein.

159.     Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn

Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the

meaningful participation and approval of Defendant Manheimer, made the following misleading

statements while soliciting investment in the Series B Preferred Shares:

a.     July 3, 2018 to Mr. Richard Jaffee:  "These delays mean that we had to go back to

our bank and get an extension," which "means that we need to raise additional funds to refill our

interest reserve through completion.  We need to raise an additional 750k for our bank."

b.     July 3, 2018 to Mr. Richard Jaffee: "We apologize this did not go as promised,

but your investments remain very safe.  Rich[,] I know you have people very close to you in this

deal and you should not worry.  The ultimate value of the building has not taken any hit.  This

additional raise means that your breakeven point is still below 11M and we expect to sell the

building when completed for 16M or more (16M to 18M)."

160.     These statements and omissions were misleading because the real reason for

raising these funds was to address the significant cost overruns resulting from the construction

complications that continuously plagued the project, including problems with excavation of the basement and building of the foundation and other complications whose full extent and true nature are still not yet known to date.  Also, the value of the building had decreased because the basement no longer was available as rentable retail or commercial space and, based on declines in the real estate market, the Property would not be able to sell for over $16 million without the additional rentable retail space.

161.    Before the Series B Plaintiffs invested on October 1, 2018, the Series B Defendants deliberately failed to correct the misstatements made by Mr. Kohn or disclose the truth concealed by Mr. Kohn's misstatements.

162.    These statements and omissions were material because, had the Series B Plaintiffs known about the cost overruns resulting from the construction complications or that the plan for a rentable basement had been abandoned, they would not have made their investment into 157-159 Wythe Avenue Investors LLC, as the threats of delay and cost overruns far outweighed the limited potential return of 15% for an investment that was subordinated to another round of preferred equity, especially since the Series B Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

163.    These statements and omissions were made with scienter because the Series B Defendants knew that it would be easier to attract investment from people who already had invested in the Project if they explained the need for funds as an unlucky delay from the DOB rather than admitting to the cost overruns resulting from construction complications and to abandoning the plan for a rentable basement.  Therefore, they deliberately chose to misrepresent and omit the true facts.

164.    These statements and omissions were made in connection with the purchase and sale of securities because the Series B Defendants made these statements and omissions with the intention of inducing Mr. Richard Jaffee, as well as any other investors he recruited, to purchase the Series B Preferred Shares.

165.    Reasonably relying on the Series B Defendants' misrepresentations and omissions, the Series B Plaintiffs concluded that a return of 15% was reasonable considering that the Series B Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

166.    On or about October 1, 2018 Mr. Richard Jaffee and Mr. Schwartz (collectively, the "Series B Plaintiffs") invested in shares in 157-159 Wythe Avenue Investors LLC as follows:

e.    Mr. Richard Jaffee purchased 150 units for $150,000;

f.    Mr. Schwartz, in his capacity as trustee of the Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz, purchased 150 units for $150,000.

167.    The Series B Preferred Shares, and in turn, the Shares in 157-159 Wythe Avenue Investors LLC are worthless, as the Project ran out of money and Defendants were forced to sell the Property in its unfinished state for a sale price below the amount necessary for any Series B Plaintiff to recoup any of his investment.

168.    The Series B Plaintiffs' losses were caused by the materialization of the risk misrepresented and concealed by the Series B Defendants, namely that cost overruns and delays from known construction problems would cause the Project to run out of money before completion.

169.    As a result of the Series B Defendants' fraudulent inducement of the Series B

Plaintiffs' investments, the Series B Defendants are jointly and severally liable to each Series B

Plaintiff for the amount of his investment in the 157-159 Wythe Avenue Investors LLC Shares,

as well as attorney's fees, interest, costs, and disbursements under applicable law and Paragraph

4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC.

### FIFTH CLAIM
**By the Series B Plaintiffs against the Series B Defendants**
**(Common Law Fraudulent Inducement/Fraudulent Concealment)**

170.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

168 of this Complaint, as if set forth at length herein.

171.    Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn

Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the

meaningful participation and approval of Defendant Manheimer, made the following misleading

statements while soliciting investment in the Series B Preferred Shares:

a.    July 3, 2018 to Mr. Richard Jaffee:  "These delays mean that we had to go back to

our bank and get an extension," which "means that we need to raise additional

funds to refill our interest reserve through completion.  We need to raise an

additional 750k for our bank."

b.    July 3, 2018 to Mr. Richard Jaffee: "We apologize this did not go as promised,

but your investments remain very safe.  Rich[,] I know you have people very

close to you in this deal and you should not worry.  The ultimate value of the

building has not taken any hit.  This additional raise means that your breakeven

point is still below 11M and we expect to sell the building when completed for

16M or more (16M to 18M)."

172.    These statements and omissions were misleading because the real reason for raising these funds was to address the significant cost overruns resulting from the construction complications that continuously plagued the project, including problems with excavation of the basement and building of the foundation and other complications whose full extent and true nature are still not yet known to date. Also, the value of the building had decreased because the basement no longer was available as rentable retail or commercial space and, based on declines in the real estate market, the Property would not be able to sell for over $16 million without the additional rentable retail space.

173.    The Series B Defendants had a duty to speak because they had superior knowledge the aforementioned issues, such knowledge was not readily available to the Series B Plaintiffs, and the Series B Defendants knew that the Series B Plaintiffs were investing in the 157-159 Wythe Avenue Investors LLC shares on the basis of mistaken knowledge.

174.    The Series B Defendants also had a duty to speak because Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the following misleading statements while soliciting investment in the Series B round of funding:

175.    Before the Series B Plaintiffs invested on October 1, 2018, the Series B Defendants deliberately failed to correct the misstatements made by Mr. Kohn or disclose the truth concealed by Mr. Kohn's misstatements.

176.    These statements and omissions were material because, had the Series B Plaintiffs known about the cost overruns resulting from the construction complications or that the plan for a rentable basement had been abandoned, they would not have made their investment into 157-

159 Wythe Avenue Investors LLC, as the threats of delay and cost overruns far outweighed the limited potential return of 15% for an investment that was subordinated to another round of preferred equity, especially since the Series B Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

177.    These statements and omissions were made with scienter because the Series B Defendants knew that it would be easier to attract investment from people who already had invested in the Project if they explained the need for funds as an unlucky delay from the DOB rather than admitting to the cost overruns resulting from construction complications and to abandoning the plan for a rentable basement.  Therefore, they deliberately chose to misrepresent and omit the true facts.

178.    These misrepresentations and omissions were made with the intent to induce reliance because the Series B Defendants made these misrepresentations and omissions with the intention of inducing Mr. Richard Jaffee, as well as any other investors he recruited, to invest in the Series B round of funding.

179.    Reasonably relying on the Series B Defendants' misrepresentations and omissions, the Series B Plaintiffs concluded that a return of 15% was reasonable considering that the Series B Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

180.    On or about October 1, 2018 Mr. Richard Jaffee and Mr. Schwartz (collectively, the "Series B Plaintiffs") invested in shares in 157-159 Wythe Avenue Investors LLC as follows:

a.       Mr. Richard Jaffee purchased 150 units for $150,000;

b.      Mr. Schwartz, in his capacity as trustee of the Jeanne D. Schwartz Family Trust

FBO Kenneth Schwartz, purchased 150 units for $150,000.

181.    The Series B Preferred Shares, and in turn, the Shares in 157-159 Wythe Avenue

Investors LLC are worthless, as the Project ran out of money and Defendants were forced to sell

the Property in its unfinished state for a sale price below the amount necessary for any Series B

Plaintiff to recoup any of his investment.

182.    The Series B Plaintiffs' losses were caused by the materialization of the risk

misrepresented and concealed by the Series B Defendants, namely that cost overruns and delays

from known construction problems would cause the Project to run out of money before

completion.

183.    As a result of the Series B Defendants' fraudulent inducement of the Series B

Plaintiffs' investments, the Series B Defendants are jointly and severally liable to each Series B

Plaintiff for the amount of his investment in the 157-159 Wythe Avenue Investors LLC shares,

as well as attorney's fees, interest, costs, and disbursements under applicable law and Paragraph

4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC.

### SIXTH CLAIM
### By the Series B Plaintiffs against the Series B Defendants
### (Negligent Misrepresentation/Omission)

184.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

182 of this Complaint, as if set forth at length herein.

185.    Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn

Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the

meaningful participation and approval of Defendant Manheimer, made the following misleading

statements while soliciting investment in the Series B Preferred Shares:

a.    July 3, 2018 to Mr. Richard Jaffee:  "These delays mean that we had to go back to our bank and get an extension," which "means that we need to raise additional funds to refill our interest reserve through completion.  We need to raise an additional 750k for our bank."

b.    July 3, 2018 to Mr. Richard Jaffee: "We apologize this did not go as promised, but your investments remain very safe.  Rich[,] I know you have people very close to you in this deal and you should not worry.  The ultimate value of the building has not taken any hit.  This additional raise means that your breakeven point is still below 11M and we expect to sell the building when completed for 16M or more (16M to 18M)."

186.    These statements and omissions were misleading because the real reason for raising these funds was to address the significant cost overruns resulting from the construction complications that continuously plagued the project, including problems with excavation of the basement and building of the foundation and other complications whose full extent and true nature are still not yet known to date.  Also, the value of the building had decreased because the basement no longer was available as rentable retail or commercial space and, based on declines in the real estate market, the Property would not be able to sell for over $16 million without the additional rentable retail space.

187.    The Series B Defendants had a duty to speak because they had superior knowledge the aforementioned issues, such knowledge was not readily available to the Series B Plaintiffs, and the Series B Defendants knew that the Series B Plaintiffs were investing in the 157-159 Wythe Avenue Investors LLC shares on the basis of mistaken knowledge.

188.    The Series B Defendants also had a duty to speak because Defendant Kohn, speaking in his capacity as a manager of Defendant Brooklyn Standard in its capacity as managing member of 157-159 Wythe Avenue LLC, and with the meaningful participation and approval of Defendant Manheimer, made the aforementioned misleading statements while soliciting investment in the Series B round of funding.

189.    Before the Series B Plaintiffs invested on October 1, 2018, the Series B Defendants deliberately failed to correct the misstatements made by Mr. Kohn or disclose the truth concealed by Mr. Kohn's misstatements.

190.    These statements and omissions were material because, had the Series B Plaintiffs known about the cost overruns resulting from the construction complications or that the plan for a rentable basement had been abandoned, they would not have made their investment into 157-159 Wythe Avenue Investors LLC, as the threats of delay and cost overruns far outweighed the limited potential return of 15% for an investment that was subordinated to another round of preferred equity, especially since the Series B Plaintiffs could have purchased common equity in a project of similar actual risk and at least have had the potential for more unrestricted upside.

191.    The Series B Defendant should have known that these misrepresentations and omissions were misleading and erroneously would lead the Series B Plaintiffs to conclude that the Series B Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

45

192.    These statements were made with the intent to induce reliance because the Series B Defendants made these statements and omissions with the intention of inducing Mr. Richard Jaffee, as well as any other investors he recruited, to invest in the Series B round of funding.

193.    Reasonably relying on the Series B Defendants' misrepresentations, the Series B Plaintiffs concluded that a return of 15% was reasonable considering that the Series B Preferred Equity Shares primarily would be used to fund an interest reserve for the ReadyCap Loan, most of the remaining construction costs would be covered by money already raised through the common equity round, and there were no major foreseeable construction-related risks.

194.    On or about October 1, 2018 Mr. Richard Jaffee and Mr. Schwartz (collectively, the "Series B Plaintiffs") invested in shares in 157-159 Wythe Avenue Investors LLC as follows:

    a.    Mr. Richard Jaffee purchased 150 units for $150,000;

    b.    Mr. Schwartz, in his capacity as trustee of the Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz, purchased 150 units for $150,000.

195.    The Series B Preferred Shares, and in turn, the Shares in 157-159 Wythe Avenue Investors LLC are worthless, as the Project ran out of money and Defendants were forced to sell the Property in its unfinished state for a sale price below the amount necessary for any Series B Plaintiff to recoup any of his investment.

196.    The Series B Plaintiffs' losses were caused by the materialization of the risk misrepresented and concealed by the Series B Defendants, namely that cost overruns and delays from known construction problems would cause the Project to run out of money before completion.

197.    As a result of the Series B Defendants' negligent inducement of the Series B Plaintiffs' investments, the Series B Defendants are jointly and severally liable to each Series B

Plaintiff for the amount of his investment in the 157-159 Wythe Avenue Investors LLC shares, as well as attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC.

WHEREFORE, Plaintiffs seek the following relief:

I.  Judgment against the Series A Defendants (Defendants Brooklyn Standard, 157-159 Wythe Avenue LLC, Kohn, and Manheimer), jointly and severally:

a.  In favor of Mr. Richard Jaffee, in his capacity as owner of the of IRA Services Trust Company CFBO Richard Jaffee, IRA #731316 (the "Richard Jaffee IRA") in the amount of $100,000, plus attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares;

b.  In favor of Thomas Jaffee in the amount of $75,000, plus attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares;

c.  In favor of Mr. Klein, in his capacity as owner of IRA Services Trust Company CFBO Eric Klein, IRA #732722l in the amount of $100,000, plus attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares; and

d.  In favor of Mr. Samuels in the amount of $100,000, plus attorney's fees, interest, costs, and disbursements nder applicable law and Paragraph 4(c) of the Investment Agreement for the Series A Preferred Shares.

II.    Judgment against the Series B Defendants (Defendants Brooklyn Standard, 157-159 Wythe Avenue LLC, 157-159 Wythe Avenue Investors LLC, Kohn, and Manheimer), jointly and severally:

      a.   In favor of Mr. Richard Jaffee in the amount of $150,000, plus attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC;

      b.   In favor of Mr. Schwartz, in his capacity as trustee of the Jeanne D. Schwartz Family Trust FBO Kenneth Schwartz, in the amount of $150,000, plus attorney's fees, interest, costs, and disbursements under applicable law and Paragraph 4(c) of the Investment Agreement for 157-159 Wythe Avenue Investors LLC.

III.    Any other relief deemed just and proper.

Dated: August 29, 2019

                            _____s/ Mark S. Pincus_____
                            Mark S. Pincus
                            Travis J. Mock
                            PINCUS LAW LLC
                            90 Broad Street, 23rd Floor
                            New York, New York 10004
                            (212) 962-2900
                            mark@pincus-law.com
                            *Attorneys for Plaintiffs*